# United States Court of Appeals for the Federal Circuit

---

**MARCUM LLP,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2014-5001

---

Appeal from the United States Court of Federal Claims in No. 13-CV-0189, Judge Marian Blank Horn.

---

Decided: June 13, 2014

---

ANDREW S. ITTLEMAN, Fuerst Ittleman David & Joseph, PL, of Miami, Florida, argued for plaintiff-appellant. With him on the brief were MITCHELL S. FUERST and JOSEPH A. DIRUZZO, III.

JAMES SWEET, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Assistant Attorney General, BRYANT G. SNEE, Acting Director, and REGINALD T. BLADES, JR., Assistant Director.

---

Before RADER,[*] DYK, and O'MALLEY, *Circuit Judges.*

RADER, *Circuit Judge.*

The United States Court of Federal Claims dismissed Marcum LLP's (Marcum) Fifth Amendment takings claim for lack of subject matter jurisdiction. *Marcum LLP v. United States*, 112 Fed. Cl. 167, 179 (Fed. Cl. 2013). The claim seeks compensation for unpaid legal fees incurred for work rendered as a court-appointed legal services provider pursuant to the Criminal Justice Act (CJA). Because the CJA provides its own remedial scheme, Marcum cannot collaterally attack the Fifth Circuit's determination of Marcum's fee awards under the Tucker Act. Accordingly, this court affirms.

I.

This case arises from the United States' criminal prosecution of Allan R. Stanford. In June 2009, the Securities and Exchange Commission indicted Stanford for operating a multi-billion dollar Ponzi scheme. J.A. 19. After indictment, the United States seized most of his personal and business assets rendering him an indigent defendant.

Under the CJA, counsel for an indigent defendant may request expert services necessary for adequate representation. 18 U.S.C. § 3006A(e)(1). The court or magistrate judge "shall" authorize those services upon a finding of sufficient need. *Id.* Stanford's court-appointed counsel obtained authorization for legal services under § 3006A(e)(1) from the district court. J.A. 20. Stanford's counsel then employed Marcum for forensic accounting and litigation support services. *Id.* at 19–20. Marcum submitted an estimated budget of $4.5 million to the

---

[*]    Randall R. Rader vacated the position of Chief Judge on May 30, 2014.

district court for approval before rendering any services. *Id.* at 21. The district court approved the initial budget, but Marcum did not obtain approval from the Chief Judge of the U.S. Court of Appeals for the Fifth Circuit. *Id.*

The CJA requires that expenses exceeding $2,400 be certified by the district court and approved by the chief judge of the regional circuit. 18 U.S.C. § 3006A(e)(3). Marcum's work far exceeded that amount. Consequently, Marcum submitted monthly vouchers for work performed. It first submitted vouchers for certification for the work it performed in June, July, and August 2011. Marcum received full payment for those vouchers in October 2011. J.A. 22. Marcum then submitted vouchers for work performed in September, October, and November 2011 totaling $845,588.48. *Id.* The district court, however, certified only the September and October vouchers. *Id.* By December 30, 2011, Marcum had not received payment for any of these vouchers. *Id.* As a result, Marcum attempted to resign from the case. *Id.*

On January 4, 2012, Chief Judge Edith Jones of the Fifth Circuit issued a Service Provider Continuity and Payment Order (the Order) for payment to Marcum. *Id.* at 24. The Order authorized payment of $205,000 for the September and October vouchers. *Id.* Additionally, Chief Judge Jones ordered Marcum to continue working on the case because "[i]t would be neither feasible nor economical to obtain a replacement to perform the services Marcum was expected by counsel to provide." *Id.* Chief Judge Jones also scheduled a contempt hearing for January 9, 2011 in the event Marcum did not comply with the Order. *Id.* Under threat of contempt sanctions, Marcum continued to work for Stanford through the end of trial. *Id.* at 25. Marcum alleges that its total unpaid fees amounted to approximately $1.2 million. *Id.*

During this time, Marcum challenged the Order through various avenues of review. Marcum filed an ex

parte emergency motion for reconsideration before Chief Judge Jones. *Id.* Marcum followed this with an emergency application for a stay before the Supreme Court of the United States. *Id.* Marcum next filed an emergency motion for a stay or, in the alternative, a petition for writ of mandamus before the Fifth Circuit. *Id.* Finally, Marcum petitioned the Supreme Court for a writ of mandamus. All of these challenges were denied. *Id.* at 24. Although Marcum continued to work on Stanford's case, Marcum appears to have limited the subject matter of these challenges to compensation for the September, October, and November vouchers.

Having failed to overturn the Order through other avenues of review, Marcum filed a complaint for unpaid legal fees with the Court of Federal Claims on March 13, 2013. *Id.* at 16. The trial court dismissed the claim for lack of subject matter jurisdiction on August 2, 2013. Marcum timely appealed to this court.

## II.

The Court of Federal Claims is a court of limited jurisdiction. *Terran v. Sec'y of Health & Human Servs.*, 195 F.3d 1302, 1309 (Fed. Cir. 1999). "[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Waiver of sovereign immunity must be express. *Id.*

The Tucker Act gives the Court of Federal Claims jurisdiction over claims against the United States. *Testan*, 424 U.S. at 397; *see also* 28 U.S.C. § 1491. The Tucker Act expressly waives sovereign immunity for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied

contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

"The Tucker Act is displaced, however, when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." *United States v. Bormes*, 133 S. Ct. 12, 18 (2012); *see also St. Vincent's Med. Ctr. v. United States*, 32 F.3d 548, 549–50 (Fed. Cir. 1994). For example, in *Shearin v. United States*, this court held that the remedial scheme of the CJA preempts Tucker Act jurisdiction over challenges to fee awards for court-appointed attorneys. 992 F.2d 1195, 1197 (Fed. Cir. 1993). For the same reason, this court concludes that the remedial scheme of the CJA preempts Tucker Act jurisdiction over Marcum's claim.

## III.

On appeal, Marcum argues this court's decision in *Shearin* did not address whether the CJA preempted a Fifth Amendment takings claim and thus its claim is distinguishable. This court, therefore, clarifies the opinion in *Shearin* and holds that the CJA preempts a takings claim for CJA fee award determinations brought under the Tucker Act.

Contrary to Marcum's assertions, the reasoning in *Shearin* applies to this case. The CJA provides an explicit procedure for court-appointed service providers to collect compensation for their services. Under 18 U.S.C. § 3006A(e)(3), expenses exceeding $2,400 must be certified by the district court and approved by the chief judge of the circuit. In *Shearin*, this court reasoned that "Congress placed jurisdiction for review and determination of attorney fees under the CJA within the presiding tribunals." 992 F.2d at 1197. To allow collateral review under the Tucker Act would be to allow parties "to bypass the system of review and recovery established by Congress." *Id.*

This principle applies equally to Fifth Amendment takings claims as it does to other causes of action under the Tucker Act. If this court were to allow collateral review of a fee award determination under the Tucker Act, any party dissatisfied with a CJA fee award could assert a takings claim at the Court of Federal Claims. Such a broad reading of Tucker Act jurisdiction runs counter to the limited scope of review for fee award determinations envisioned by Congress in the CJA. *See* 18 U.S.C. § 3006A(e)(3); *United States v. D'Andrea*, 612 F.2d 1386, 1388 (7th Cir. 1980) ("[I]f a statute imposes a specific duty upon the chief judge of a circuit there is no remedy for review of his decision as such other than an application to the Supreme Court for mandamus.").

This court's holding is not altered by the fact that a chief judge's approval of fee awards under the CJA is an administrative rather than judicial act. *See Shearin*, 992 F.2d at 1197. Many of our sister circuits have denied appellate review of fee awards under the CJA. Those decisions based their denial of review on recognition of the chief judge's approval as an administrative act. *See, e.g.*, *United States v. Davis*, 953 F.2d 1482, 1497 n.21 (10th Cir. 1992); *United States v. Rodriguez*, 833 F.2d 1536, 1538 (11th Cir. 1987); *United States v. Melendez-Carrion*, 811 F.2d 780, 781–82 (2d Cir. 1987); *In re Baker*, 693 F.2d 925, 926 (9th Cir. 1982) ("Except for the limited administrative review of the district court's certification by the chief judge of the circuit, the CJA makes no provision for appeal of an order for payment of attorneys' fees, and its legislative history provides no suggestion that one was intended."); *United States v. Smith*, 633 F.2d 739, 741 (7th Cir. 1980) ("None of the indicia accompanying an adversary proceeding exist."). The CJA precludes jurisdiction under the Tucker Act precisely because Congress saw fit to curtail review by placing fee award determinations within the discretion of the presiding tribunals. *Shearin*, 992 F.2d at 1197; *cf. United States v. Erika*, 456 U.S. 201,

208 (1982) ("In the context of the statute's precisely drawn provisions, [the omission of further review] provides persuasive evidence that Congress deliberately intended to foreclose further review of such claims.").

Nor does the CJA remedial scheme foreclose the due process rights of court-appointed service providers. Those seeking greater fee awards have the opportunity to file a motion for reconsideration with the chief judge of the regional circuit and petition the Supreme Court for a writ of mandamus. *D'Andrea*, 612 F.2d at 1387–88. These measures sufficiently protect the due process rights of a party seeking increased fee awards under the CJA.

Finally, while this court is not deciding the issue, it appears that Marcum could have avoided losses by following proper CJA procedure. The Guidelines for the Administration of the Criminal Justice Act for the Southern District of Texas (CJA Guidelines) instruct court-appointed experts to seek fee approvals from the chief judge prior to rendering services. *See* CJA Guidelines § 320.20; Instructions for CJA Form 21, *available at* http://www.uscourts.gov/FormsAndFees/Forms/CJAForms /InstructionsForCJAForm21.aspx. Marcum sought approval for compensation from Chief Judge Jones only *after* performance of its services. J.A. 22. By not seeking prior authorization, Marcum ran the risk of receiving only partial compensation for services rendered. *See Smith*, 633 F.2d at 741 ("[I]t is also clear that Congress did not intend to provide full compensation and that it contemplated appointments of private counsel to supplement the efforts of professional defender organizations.").

## IV.

In sum, the CJA is a self-executing remedial scheme for the review of fee awards. To grant jurisdiction under the Tucker Act on Fifth Amendment takings grounds would undermine that Act's express intent to limit the scope of review. For these reasons, the Court of Federal

Claims correctly dismissed Marcum's claim for lack of subject matter jurisdiction.

**AFFIRMED**